John J. Scully, as Receiver for Safeway Construction Company, Plaintiff-Appellee, v. Morrison Hotel Corporation, Defendant-Appellant.

**Gen. No. 52,144.**

First District, Fourth Division.

December 24, 1969.

William Henning Rubin, Thomas P. Sullivan, and Donald R. Harris, of Chicago (Raymond, Mayer, Jenner & Block, of counsel), for appellant.

Philip Conley and Barry B. Nekritz, of Chicago (Mitchell Edelson, Sr. and William N. Wise, of counsel), for appellee.

MR. JUSTICE STAMOS delivered the opinion of the court.

Plaintiff, John J. Scully, as Receiver for Safeway Construction Company, filed a complaint at law against defendant Morrison Hotel Corporation alleging a balance due Safeway of $136,360.36 on an oral agreement for work performed and monies expended by Safeway at the Morrison Hotel. After defendant's answer was filed denying the existence of the agreement, plaintiff filed a reply amending his claim to include an additional amount owed Safeway by the defendant of $29,080 representing the salary of Safeway's superintendent at the Morrison which was allegedly agreed to be paid by the defendant. The jury returned a verdict of $136,360.36 in favor of plaintiff, on which the judgment was entered and from which this appeal is taken by defendant.

Defendant seeks reversal of the trial court's adverse ruling on its motion for a directed verdict, or in the alternative, requests a new trial contending that the verdict is against the manifest weight of the evidence and that the trial court erred in making certain evidentiary rulings.

In the fall of 1956, Murray Gold, president of Safeway Construction Company, had a series of meetings with William H. Rubin, president of the defendant. The matters discussed at these meetings are in dispute, as are the subsequent events.

Gold testified that in October of 1956 Rubin requested him to assume direction of the contracting work at the Morrison Hotel, to put the various laborers on Safeway's payroll and to supervise the work done, allegedly,

because Rubin was having problems with some of these workers.

Gold further testified that soon after the initial meeting which had occurred in Rubin's office, another meeting was held there with Harold Kerman, Gold's fellow stockholder, director, and officer of Safeway, and Burke, auditor of the defendant, now deceased. Gold stated that at this second meeting an agreement was reached whereby Safeway would take over direction of the workers at the Morrison Hotel putting them on its payroll in return for a cost plus consideration which was based on the total payroll of the workers plus 10% for insurance and taxes, 12% overhead, and 10% profit.

Rubin testified, however, that Gold approached him about assuming the work at the Morrison in order to create a reference for future jobs. Rubin stated that at that time he was having no problems with his laborers, but that at the request of Gold he entered into an arrangement whereby the laborers were to be taken over by Safeway on a cost basis including only payroll plus 10% to cover insurance and taxes.

Kerman's only recollection of meetings wherein terms were allegedly discussed occurred late in 1956 before actual work started. He testified that at one meeting in the coffee shop of the Morrison Hotel with Gold, Rubin and Kerman present, Rubin requested Gold to take over the work at the Morrison, because Rubin was having trouble with the laborers; that at a second meeting attended by Rubin, Gold, Grande, the Hotel's general manager, and Kerman there was a discussion about which specific trade union laborers were to be taken over, but that he left early and recalls nothing else.

Gold testified that thereafter Safeway started first assuming the payroll for the painters and later the carpenters, steamfitters, and plumbers and that the normal billing procedure he followed was to take the

256

time cards at the end of the week back to the office and prepare invoices therefrom for presentation on the following Monday. While the first week's invoices reflected the profit and overhead, this practice was allegedly discontinued at the request of Rubin, who stated that it would be a tax benefit to omit them. Rubin, according to Gold, promised to reimburse Safeway at a later time for these figures, but even after frequent requests during the period of 1956–1959 never did. In early 1957 it became necessary to hire someone to supervise the work and Rubin agreed to assume the superintendent's salary as part of the job cost on the profit-overhead package. Safeway was never paid amounts due under this package.

Alice Galatola, office employee of Safeway testified that at the direction of Gold she filled out the weekly invoices attributable to the Morrison work after receiving the time cards of the workers from her husband, who was employed by Safeway as superintendent of the work. She stated that the billing period was Thursday to Wednesday and the invoices included the profit and overhead figures. Mrs. Galatola then testified that the original copy of the invoice was given to Mr. Gold for presentation to the Morrison.

Evidence presented at trial showed two sets of invoices. One typewritten set was for a Thursday-to-Wednesday billing period, including 10% profit and 12% overhead. The other set was in Gold's handwriting and covered a Monday-to-Saturday billing period, but did not recite any overhead and profit figures. The cancelled checks of the defendant match the amounts on the handwritten invoices and exceed the amounts in the typewritten invoices, although the latter included charges of 12% and 10% which did not appear on the handwritten invoices.

Rubin testified that the only invoices presented to him by Gold were the handwritten ones which were

257

accompanied by waivers of lien for the amounts so invoiced. Gold testified that the waivers of lien were given, because Rubin told him that the First National Bank, holder of Morrison's mortgage, required them.

Gold further testified that in February of 1959 Safeway had to cease operations at the Morrison for lack of funds due to the failure of Rubin to reimburse Safeway for the profit and overhead as per oral agreement. In March of 1959 defendant paid Safeway $7,000 and in return Gold gave Rubin a waiver of lien for "all labor furnished and material delivered to date." However, Gold stated that check and waiver were for specially priced extra work Safeway had done at the Morrison. Subsequently, Safeway returned the workers to the Morrison payroll and quit the job.

Safeway closed operations in 1959 and Scully was appointed receiver on December 8, 1959. Scully testified that he could not find the books and ledgers of Safeway after a diligent search.

Jerome Morris, attorney for Harold Kerman, stated that he had use of the books and ledgers but that the last he saw of them was in late 1961 or early 1962 in his office where they were being packed for return to Mr. Kerman.

Plaintiff stated that he brought suit in 1960 upon the advice of his attorney who allegedly based his opinion on documents prepared by Mr. Paull, a certified public accountant. Mr. Paull had been hired by Kerman in 1959 to straighten out the records of Safeway.

OPINION

The defendant initially asserts that the trial court erred in denying its motion for a directed verdict. In view of Pedrick v. Peoria & Eastern R. Co., 37 Ill2d 494, 229 NE2d 504 (1967), we hold that the ruling of the trial court was proper and the motion for a directed verdict was properly denied. For the same rea-

son, we do not agree with defendant's contention that it is entitled to an outright reversal by this court.

Defendant next asserts that the trial court erred in admitting Plaintiff's Exhibit 4 over objection. This exhibit labeled "Summary of Transactions for the Years 1956, 1957, 1958 and 1959," recites a balance due Safeway from the Morrison Hotel of $136,360.36. The document is a purported summation of the total payroll of Safeway due its employees from jobs done at the Morrison. To total payroll figures for these years in question, 10% payroll tax and insurance, 12% overhead, and 10% profit have been added. Cash receipts from the defendant have then been subtracted from that total to arrive at the balance due.

The exhibit was prepared by Mr. Kerman's accountant, Mr. Paull, who testified that the figures used in the summation were derived from worksheets provided and prepared by Safeway's two office employees, Mrs. Galatola and Mrs. Clark. The summation assumes the existence of an oral agreement for 12% overhead and 10% profit.

Paull further testified that the worksheets were computed from time sheets of Safeway's employees pertaining to the Morrison work and that some of the time sheets were unavailable. Since some were missing, the totals attributable to the Morrison work were computed by subtracting non-Morrison work from the total work hours as evidenced by these remaining sheets.

The exhibit was brought to the attention of the court during the cross-examination of John J. Scully, Receiver for Safeway and plaintiff in the cause. Defendant's counsel cross-examined Scully as to the basis for the allegations of the complaint. When the witness referred to documents in the possession of his attorney, defense counsel requested their production. Among those then presented was Plaintiff's Exhibit 4. Defense counsel

then briefly questioned Scully as to whether he had read the documents produced and the witness stated that he could not remember whether or not he had.

After cross-examination plaintiff offered the produced documents including Plaintiff's Exhibit 4 into evidence and the court admitted them over defendant's objections.

The defendant asserts that the trial court erred in admitting Plaintiff's Exhibit 4 into evidence and that the document, as admitted, was prejudicial. In support of its contention the defendant cites authority referring to the foundation required for admissibility of summations of voluminous records, e. g., Flame Coal Co. v. United Mine Workers of America, 303 F2d 39, 45 (1962).

Plaintiff, however, maintained at oral argument that while such authority is correct and would normally preclude admission of the document, the document, nevertheless, became admissible to rehabilitate plaintiff's witness Scully. In support of the contention plaintiff cites 32A CJS, Evidence, § 759 (1964) where the English rule is discussed:

> "[W]here a party calls for a paper and inspects it, it is thereby admissible evidence in favor of, but not against, the party who produces it, even though it would have been incompetent if it had not been called for and examined."

Leonard v. Taylor, 315 Mass 580, 53 NE2d 705 (1944) is cited as American authority for this rule. In that case the court stated:

> "[W]e suspect that critics may not fully appreciate the disastrous effect upon a jury in a perfectly good case as defense of a bold and dramatic demand by opposing counsel for the production of a document at some critical moment of the trial. It may be impossible to refuse without creating an impression of evasion and concealment, and even if

the demand is acceded to it may be practically impossible to prevent the same impression without showing the document itself to the jury. It is our belief that if there is sharp practice anywhere it is more likely to be found on the side of the demanding party than on that of the party upon whom the demand is made, and that if unfortunate consequences follow, the demanding party should be the one to suffer them. He can commonly avoid them by utilizing his opportunities for discovery before trial or by limiting his demand to that which is competent."

The rule as adhered to by Massachusetts has been criticized in other jurisdictions. In Smith v. Rentz, 131 NY 169, 30 NE 54 (1892) the court in citing Carrodine v. Hotchkiss, 120 NY 608, 24 NE 1020 (1890) points out that the rule no longer exists in England. The court further states at page 56:

"The party who has in his possession books or papers which may be material to the case of his opponent has no moral right to conceal them from his adversary. If, on inspection, the party calling for them finds nothing to his advantage, his omission to put them in evidence does not prevent the party producing them from proving and introducing them in evidence if they are competent against the other party. The party calling for books and papers would be subjected to great hazard if an inspection merely, without more, would make them evidence in the case. That rule tends rather to the suppression than ascertainment of truth, and the opposite rule is, as it seems to us better calculated to promote the ends of justice."

In Merlino v. Mutual Service Cas. Ins. Co., 23 Wis2d 571, 127 NW2d 741 (1964) where the requested documents were used in cross-examination and later of-

fered into evidence by the opposing counsel, the court stated:

> "The underlying theory was that a party was not entitled to know or inspect the documentary evidence of the opposing party and, if he took the chance of asking that documents be produced without knowing what they contained, then he should be penalized, if he examined the produced documents, by having them admitted in evidence. This is hardly in keeping with modern trends that a lawsuit is not to be conducted as a contest of skill but rather a search for truth and justice, and discovery of evidence in possession of the opposing party is to be encouraged. Therefore, we refuse to adopt the 'English Rule.' "

Plaintiff cites Boudinot v. Winter, 190 Ill 394, 398, 60 NE 553 (1901) in support of his contention as to the applicability of the English rule in Illinois. In that case the defendant in a mortgage foreclosure action filed a cross-bill alleging that plaintiff's deceased had kept accurate books and memoranda relating to their financial arrangement and praying for discovery thereof. The plaintiff answered the cross-bill with the requested information. The court therein held that the information as produced must have equal evidentiary value, and defendant could not reject the parts or the words which disparaged his case, while accepting that which tended to aid it.

We do not deem Boudinot, supra, to be dispositive of the issue as to the applicability of the English rule in Illinois since the incompetency of evidence was not raised.

The only Illinois cases which seemingly adhere to the rule are Harper v. Ely, 70 Ill 581 (1873) and Marsh v. French, 82 Ill App 76 (1898).

In Harper, supra, the court held that where the request was for original books of account and the producing party presented only the ledger that the ledger was not admissible on behalf óf the producing party, since it was not the document requested. The court expressly declined to decide whether the original books would have been admissible.

In Marsh, supra, the issue raised was whether books of account, otherwise incompetent, produced upon request, were admissible, even though the requesting party had not inspected them. The court therein held that a mere request of such documents did not make them admissible where they were otherwise incompetent.

■ The only other authority referring to the applicability of the English rule in Illinois is 7 Wigmore, Evidence (3d ed) p 560, § 2125. Therein Civil Practice Act 1933, § 103, Rule of Court 9, par 1, is cited as adopting the rule in Illinois. Rule of Court 9, par 1, as read, however, refers only to the genuineness of the document and not to the general admissibility of normally incompetent records. Based on the foregoing, we are of the opinion that Illinois has not nor should it adopt the English rule as asserted by plaintiff and that the trial court, therefore, erred in admitting Plaintiff's Exhibit 4 into evidence.

■ We also deem such error to be prejudicial. The trial court sanctioned the document by allowing its admission and gave it the evidentiary value of admissible books of account by so doing. The jury found for plaintiff returning a verdict of $136,360.36, the precise amount recited in Plaintiff's Exhibit 4. This amount reflected the amount on the exhibit, but it is significant to note that it excluded the value of the superintendent's salary which plaintiff alleged was due and owing. It is reasonable to infer that the jury gave undue weight to improperly admitted evidence.

The judgment is reversed and the cause remanded for new trial.

We therefore do not consider it necessary to discuss the many other issues raised by plaintiff as grounds for a new trial.

Reversed and remanded.

DRUCKER, P. J. and ENGLISH, J., concur.